UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DIANE WHISMAN,                                  Case No. 08-12133

        Plaintiff,                        Bernard A. Friedman
v.                                             United States District Judge

COMMANDER MAJOR P.                             Michael Hluchaniuk
REGUALOS, *et al.*,                            United States Magistrate Judge

        Defendants.
_____/

## REPORT AND RECOMMENDATION
## <u>DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (Dkt. 76, 78)</u>

## I.    PROCEDURAL HISTORY

Plaintiff filed a complaint against defendants 127th Security Force of the

Michigan Air National Guard, Commander Lt. Col. P. Regualos, Sgt. David

Christian, Sgt. William Farrell Heatley, Jr., Sgt. Jonathan Craig Southern, Senior

Airman Raymond Wallace King, Sgt. Charlie Mitchell, and Sgt. Keith Allen

Werhnyak in their individual and official capacities on May 15, 2008.  (Dkt.1).  On

December 22, 2008, defendants filed a motion to dismiss claiming that some of

plaintiff's claims were barred by sovereign immunity, that plaintiff's claims under

28 U.S.C. § 1983 were barred because no state actors were involved, and that one

of the individual defendants was not sufficiently personally involved in the events

about which plaintiff complains.  (Dkt. 32).  Plaintiff filed a response to

defendants' motion to dismiss on February 17, 2009. (Dkt. 38). On March 2, 2009, defendants filed a reply to plaintiff's response to defendants' motion to dismiss. (Dkt. 39). A motion hearing was filed on May 12, 2009. (Dkt. 44). On May 21, 2009, the parties entered into a stipulation regarding defendants' motion to dismiss. (Dkt. 45). On June 23, 2009, based on the stipulation, plaintiff's claims against defendant 127th Security Force of the Michigan Air National Guard were dismissed with prejudice. (Dkt. 48). Defendant United States of America was also dismissed without prejudice. *Id.* Plaintiff's constitutional violation claims brought against the remaining defendants in their official capacity were dismissed with prejudice. Plaintiff's claims against the remaining defendants in their individual capacities for violation of 42 § U.S.C. 1983 were dismissed with prejudice. *Id.* Plaintiff's claims against defendants in their individual capacities for violation of the Fourteenth Amendment were dismissed with prejudice. *Id.* Finally, plaintiff claims that defendants violated the constitutional rights of plaintiff or her decedent by falsely and publicly stating that the shooting was justified were dismissed with prejudice. *Id.*

On July 17, 2009, plaintiff filed an amended complaint to bring *Bivens* claims against Lt. Col. P. Regualos, Sgt. David Christian, Sgt. William Farrell Heatley, Jr., Sgt. Jonathan Craig Southern, Senior Airman Raymond Wallace King, Sgt. Charlie Mitchell, and Sgt. Keith Allen Werhnyak, individually and in their

official capacities.  (Dkt. 49).  Defendants filed an answer to plaintiff's amended

complaint on August 3, 2009.  (Dkt. 50).  On October 26, 2009, District Judge

John Feikens referred this matter to the undersigned for all pretrial purposes.  (Dkt.

52).  Plaintiff filed a second lawsuit against defendant United States on December

12, 2009.  (Case No. 09-14773, Dkt.1).  On April 1, 2010, the two cases were

consolidated for purposes of trial.  (Dkt. 56).  By stipulation of the parties,

defendant Southern was dismissed from this action with prejudice on April 11,

2011.  (Dkt. 74).

The remaining individual defendants filed a motion for summary judgment

on April 13, 2011.  (Dkt. 76).  On April 14, 2011, defendant United States filed a

motion for summary judgment.  Plaintiff filed a response to defendant United

States' motion for summary judgment on May 24, 2011.  (Dkt. 81).  On May 24,

plaintiff also filed a response to the individual defendants' motion for summary

judgment. (Dkt. 82).  Defendant United States filed a reply to plaintiff's response

to defendant's motion for summary judgment on June 6, 2011.  (Dkt. 85).  On June

6, 2011, the individual defendants' also filed a reply to plaintiff's response.  (Dkt.

87).  The parties filed a joint statement of resolved and unresolved issues on June

7, 2011.  (Dkt. 88).  A motion hearing was held on June 9, 2011 on both motions

for summary judgment.  (Dkt. 87).

This matter is now ready for report and recommendation. For the reasons set

Report and Recommendation
Motions for Summary Judgment
*Whisman v. Regualos*; Case No. 08-12133

forth below, the undersigned **RECOMMENDS** that defendants' motions be

**GRANTED**.

## II.    FACTUAL BACKGROUND

### A.    Chronology of Events

On May 17, 2006, Mr. Whisman drove his vehicle, a red Geo tracker, onto

Selfridge Air National Guard Base (Selfridge).  (Dkt. 1; Dkt. 77-50).  Selfridge is

an active military guard base located in the Detroit metropolitan area, with military

assets that include fighter jets, cargo planes, and munitions.  (Dkt.78-2).  The base

was populated with Air Force and Air National Guard personnel, their dependants

and families, civilian employees, and other Department of Defense personnel.  *Id*.

Mr. Whisman entered the base through the main gate.  (Dkt. 1).  This entrance had

a stop sign, a guardhouse, a sign stating that it was unlawful to enter without

permission, and signs advising motorists to approach slowly, be prepared to stop,

show identification, and proceed only after being directed to do so by security

officers.  (Dkt. 78-2).  Mr. Whisman did not stop at the guard station.  (Dkt.78-3;

Dkt. 78-4).  According to plaintiff, the video shows Mr. Whisman quickly driving

up to the guard shack, slowing down and following a white car, who had stopped

for only a couple of seconds, and proceeding onto Jefferson going south.  (Dkt. 81,

Ex. 53).

After Mr. Whisman failed to stop, Selfridge's central dispatch immediately

broadcast to security personnel that Mr. Whisman's vehicle had run the main gate and was driving at a high rate of speed. *Id.* Security personnel responded to the dispatch, including defendants Sgt. Christian and Sgt. Mitchell, in one-man units, as well as Staff Sgts. Patrick Probyn and Bradley Vermeesch, in a two-man unit. (Dkt.78-6; Dkt.78-9; Dkt.78-11; Dkt.78-13).

Security personnel began to form Traffic Control Points (TCPs) (partial roadblocks intended to induce an oncoming vehicle to stop) in an effort to stop Mr. Whisman. *Id.* Mr. Whisman approached a TCP set up by Sgt. Mitchell and Sgt. Christian, but failed to slow down or stop, and instead swerved around it. (Dkt. 78-6; Dkt. 78-9; Dkt. 77-42; Dkt. 77-45). Sgt. Mitchell, Sgt. Christian, and Staff Sgts. Probyn and Vermeesch then continued pursuit. (Dkt. 78-6; Dkt. 78-9; Dkt. 78-11; Dkt. 78-13). The emergency equipment, including lights and sirens, were fully activated on each security vehicle. (Dkt. 77-42; Dkt. 77-43; Dkt. 77-45). According to plaintiff, Sgt. Christian testified that he and Sgt. Mitchell drove straight towards Mr. Whisman's vehicle going north on Jefferson while Mr. Whisman was going south. They pulled over to the side of the road and Mr. Whisman drove between the officers' vehicles. (Dkt. 81, Ex. 42, p. 18). This occurred after Staff Sgt. Probyn's vehicle drove directly at Mr. Whisman and Mr. Whisman swerved to avoid contact. (Dkt. 81, Exs. 53, 11, 13).

Mr. Whisman continued driving at a high rate of speed on George Avenue

past a housing area with children standing on the side of the road and then onto

General Andrews Drive, a road that passes through the base golf course. (Dkt.

78-1; Dkt. 78-6). After Mr. Whisman turned onto West Perimeter Road,

defendants Sgt. Southern and Sgt. Heatley, in a two-man unit, joined Sgt.

Christian, Sgt. Mitchell, and Staff Sgts, Probyn and Vermeesch in the pursuit of

Mr. Whisman. (Dkt. 78-7; Dkt. 78-12). Speeds during the pursuit on these roads

ranged from 50-90 mph. (Dkt. 78-6; Dkt. 78-9). Sgt. Christian and Sgt. Mitchell

repeatedly attempted to pass Mr. Whisman in order to box him in and bring him to

a stop. *Id*. Each time this was attempted, Mr. Whisman swerved back and forth,

forcing them to back off. *Id*.

On West Perimeter Road, just south of Joy Boulevard, Intercept Officer John

Bery stopped his vehicle to establish a TCP. (Dkt. 78-3; Dkt. 78-6; Dkt. 78-7).

According to defendant, when Mr. Whisman encountered the TCP, he drove

through it at a high rate of speed without stopping. *Id*. Mr. Whisman drove his

vehicle directly at Officer Bery, forcing him to run for cover to avoid being struck.

*Id*. Following the encounter on Joy Boulevard, Mr. Whisman continued to drive

around the base, eventually entering the control tower parking lot. (Dkt. 78-6; Dkt.

78-7). Sgt. Christian followed Mr. Whisman into the lot, while Sgt. Mitchell

stopped his vehicle in order to block the exit. (Dkt. 78-6, Dkt. 78-9). Mr.

Whisman then accelerated toward Sgt. Mitchell, hitting the front driver's side of

Sgt. Mitchell's vehicle and an adjacent parked vehicle, as he forced his way out of the lot and onto Joy Boulevard.  (Dkt. 78-6, Dkt. 78-9; Dkt. 78-38; Dkt. 78-40).  Sgt. Christian followed Mr. Whisman out of the lot and continued pursuit.  (Dkt. 77-42).  According to plaintiff, Mr. Whisman appeared to drive around the blocking vehicle with Officer Bery standing in the way waving at Mr. Whisman to slow down.  (Dkt. 81, Ex. 53, pp. 16-19).

Sgt. Southern and Sgt. Heatley had stopped their vehicle in the westernmost entrance of the control tower to help block Mr. Whisman in the parking lot.  (Dkt. 78-7).  As Sgt. Heatley saw Mr. Whisman traveling down Joy Boulevard, he fired four shots at the tires of Mr. Whisman's vehicle.  *Id*.  The shots did not strike the tires.  *Id*.  Meanwhile, Staff Sergeants Probyn and Vermeesch established a TCP at the intersection of Joy Boulevard and W. Perimeter Road.  (Dkt. 78-11; Dkt. 78-13).  According to defendants, to avoid the TCP, Mr. Whisman went off the roadway and onto the grass before returning to the road.  (Dkt. 77-42).  Staff Sgt. Vermeesch had to move quickly to the side to avoid being hit by Mr. Whisman's vehicle.  (Dkt.77-42; Dkt. 78-13).  According to plaintiff, Sgt. Mitchell gave Mr. Whisman a small amount of room to drive around Mitchell's vehicle.  As Mr. Whisman drove between Sgt. Mitchell's vehicle and a parked car, he hit the driver's front panel and/or bumped into a parked car as he squeezed through the opening.  (Dkt. 81).  Sgt. Christian, who was following Mr. Whisman, testified that

he drove through the same opening and continued following Mr. Whisman.  (Dkt. 42, p. 40).

Next, Mr. Whisman turned onto W. Perimeter Road and continued at a high rate of speed.  (Dkt. 78-6).  Sgt. Christian, Sgt. Mitchell, Sgt. Southern and Sgt. Heatley followed Mr. Whisman in pursuit.  (Dkt. 78-6; Dkt. 78-7).  In an effort to get Mr. Whisman to stop, Sgt. Christian fired a single warning shot at the back of Mr. Whisman's vehicle.  (Dkt. 77-42).  Christian did not aim for nor did he hit Mr. Whisman.  *Id*.  Sgt. Christian then attempted to pass Mr. Whisman in an effort to box him in.  *Id*.  Mr. Whisman swerved to prevent Sgt. Christian from passing him. *Id*.  Sgt. Mitchell, believing Sgt. Christian to be in danger, fired his handgun one time at Mr. Whisman.  (Dkt.77-45).  This shot did not strike Mr. Whisman.  *Id*. Plaintiff disputes Sgt. Mitchell's account of these events as in conflict with Sgt. Christian.  (Dkt. 81, Exs. 53, 59).[1]  While plaintiff argues that there is a factual

---

[1] Plaintiff also asserts that Sgt. Mitchell's testimony cannot be believed, given his history of untruthfulness.  Plaintiff offers several exhibits regarding other lawsuits and incidents in which Sgt. Mitchell was involved.  Defendants argue that this evidence is not admissible, although the basis for their argument is not clear. (Dkt. 85).  In the view of the undersigned, whether these exhibits are admissible or not, Sgt. Mitchell's testimony is generally supported by the testimony of the other officers and the video evidence.  Further, defendant has conceded for purposes of summary judgment that plaintiff did not stop and rev his engine before striking Sgt. Mitchell's vehicle.  If the facts do not indicate that an officer's force was objectively unreasonable, "his subjective state of mind [will] not change its legality."  *Franklin v. Messmer*, 111 Fed.Appx. 386, 390 (6th Cir. 2002) (Cole, J., dissenting).  If a plaintiff seeks to proffer evidence of defendant's prior conduct "to demonstrate his underlying intent in arrest, i.e., his propensity for excessive force,"

question about whether children were pulled back from the sidewalk as Mr.

Whisman sped down George Avenue next to family housing and whether golfers

scrambled out of the way as Whisman sped down General Andrews Drive,

defendants assert that the undisputed record shows that adults pulled back children

as Mr. Whisman drove past the base housing on George Avenue.  (Dkt. 78, Ex. 9,

p. 2; Ex. 43, p. 39; Ex. 45, pp. 52-59).  Defendants also point out that, while Sgt.

Christian did not affirmatively include a description of children being pulled back

or golfers scrambling out of the way in his testimony, he also did not deny that

these things occurred.  (Dkt. 78, Ex. 42, pp. 22-23).[2]

---

then it is proper to exclude the evidence.  *Franklin*, 111 Fed.Appx. at 388, citing
*Bowman v. Corr. Corp. of Am.*, 350 F.3d 537, 549 (6th Cir. 2003) (recognizing that
Fed.R.Evid. 404 precludes admission of prior bad acts if used to establish
propensity).  It is likely that this evidence is inadmissible, but in light of the
findings set forth above regarding the objective reasonableness of defendants'
actions, even assuming the evidence is otherwise admissible, the evidence
regarding Sgt. Mitchell's subjective intent is simply not relevant.  Indeed, even if
this evidence were admitted and Sgt. Mitchell's testimony was undermined, it
creates no issue of material fact.  For example, whether or not Mr. Whisman
stopped his vehicle before ramming Sgt. Mitchell's vehicle in the control tower
parking lot, as Sgt. Mitchell claims, whether or not golfers were forced to scramble
out of the way to avoid Mr. Whisman's vehicle, and whether or not Sgt. Christian
feared for his safety, for the reasons discussed earlier in this report and
recommendation, defendants still had sufficient reason to believe that their lives
and the lives of Selfridge residents were in danger before deciding to employ
deadly force.

  [2]  Plaintiff relies on the following testimony from Sgt. Christian, who was
asked "Other than security forces, were any pedestrians almost struck by Mr.
Whisman's car to your knowledge."  He answered "No, they were not."  (Dkt. 78,
Ex. 42, p. 114).  It does not appear that Sgt. Christian was specifically asked about

Mr. Whisman continued driving at speeds up to 70-80 mph on S. Perimeter and General Andrews Drive, past the base golf course, causing golfers to scramble out of the way.  (Dkt. 78-1; Dkt. 78-7; Dkt. 78-9).  Plaintiff disputes that golfers had to scramble out of the way and further disputes defendants' estimates of Mr. Whisman's speed.  (Dkt. 81, Exs. 42, 53).  From General Andrews Drive, Mr. Whisman turned onto George Avenue.  (Dkt. 78-9).  Officer Melvin Canty set up a blocking position at the intersection of the two roads, which Mr. Whisman avoided by going over the curb and onto the golf course and then back onto George Avenue.  (Dkt. 78-15).  Officers Henry Scott and Paul Careathers set up additional blocking positions on George Avenue, which Mr. Whisman dodged. (Dkt. 78-16; Dkt. 78-17).  Mr. Whisman continued driving down George Avenue until it became Jefferson Avenue.  (Dkt. 78-1; Dkt. 78-6).

As Mr. Whisman approached, Sgt. Werhnyak and Senior Airman King set up a TCP on Jefferson.  *Id.*  To drive past the TCP, Mr. Whisman went off the roadway and onto the grass.  *Id.*  Senior Airman King was forced to jump out of the way to avoid being struck by Mr. Whisman's vehicle.  (Dkt. 78-8; Dkt. 78-14).  According to plaintiff, the video speaks for itself and it is notable that Mr. Whisman's vehicle and the security vehicles traveled the same path.  (Dkt. 81, Exs.

---

the  golfers scrambling and children being pulled back, which may not have constituted "pedestrians almost struck by Mr. Whisman's car" in Sgt. Christian's mind when answering the question posed.

53, 59).  However, all that plaintiff appears to really dispute is whether Mr.

Whisman momentarily stopped his vehicle before driving forward and striking the

Mitchell vehicle and the parked vehicle.  (Dkt. 85, citing, Dkt. 81, pp. 5-6, 22-23,

Ex. 53, pp. 19-22).[3]  Senior Airman King then fired one shot at Mr. Whisman with

his firearm.  (Dkt. 78-8).  As Mr. Whisman drove away, Sgt. Werhnyak fired three

shots at the rear of Mr. Whisman's vehicle.  (Dkt. 78-14).  None of these shots hit

Mr. Whisman.  *Id.*

Mr. Whisman then traveled toward the base fire department building and

onto Supply Street.  (Dkt. 78-1; Dkt. 78-6).  Sgt. Mitchell, Sgt. Christian, and

Officer Canty followed in pursuit.  (Dkt. 78-6; Dkt. 78-15).  Mr. Whisman turned

left onto Jefferson Avenue and drove through the intersection of George and

Jefferson.  *Id.*  As Mr. Whisman sped through the intersection, Senior Airman King

discharged his handgun one time at Mr. Whisman and Sgt. Werhnyak fired three

shots at Whisman's vehicle's tires.  (Dkt. 77-44; Dkt. 77-49).  One of Sgt.

Werhnyak's bullets struck Mr. Whisman's front tire.  (Dkt. 77-49).  None of the

shots hit Mr. Whisman.  (Dkt. 77-44; Dkt. 77-49).

Mr. Whisman continued driving on Jefferson, avoiding TCPs set up to stop

him.  (Dkt. 77-42).  Sgt. Mitchell, Sgt. Christian, and Officer Canty followed in

---

[3]  For purposes of this motion for summary judgment, defendants do not dispute that Mr. Whisman failed to come to a stop in the control tower parking lot. (Dkt. 85).

pursuit.  (Dkt. 77-42; Dkt. 78-15).  Whisman maneuvered his vehicle to prevent

Sgt. Mitchell and Sgt. Christian from passing him.  (Dkt. 77-42; Dkt. 77-45).  Sgt.

Mitchell fired one shot at Mr. Whisman.  (Dkt. 77-45).  Mr. Whisman appeared to

flinch, and then sped up.  *Id.*  Sgt. Mitchell then fired a second shot.  *Id.*  Mr.

Whisman arched his back and leaned to his right.  *Id.*  Shortly after the second

shot, Sgt. Christian performed a pit maneuver, striking the right rear of Mr.

Whisman's vehicle with the left front of his vehicle.  (Dkt. 77-42; Dkt. 77-45).  Mr.

Whisman's vehicle went off the roadway and came to a stop in a grassy area east

of the Jefferson Avenue sidewalk.  (Dkt. 77-42; Dkt. 77-45; Dkt. 77-50).

After the vehicle came to rest, several officers exited their vehicles and

approached Mr. Whisman's vehicle on foot.  (Dkt. 78-6; Dkt. 78-7).  Mr. Whisman

was ordered out of the vehicle, but did not respond.  *Id.*  Sgt. Mitchell then pulled

Mr. Whisman out of the vehicle and placed him in handcuffs.  *Id.*  Sgt. Mitchell

checked Mr. Whisman and saw that he had two bullet wounds in his back.  *Id.*  Sgt.

Mitchell detected a pulse and shallow breathing, and EMS was immediately called

to the scene.  *Id.*  The call occurred between 8:07 and 8:09 p.m.  (Dkt. 77-50; Dkt.

78-18; Dkt. 78-19).  The first EMS ambulance to arrive at the scene came from

Selfridge's Fire Department and took less than 3 minutes to arrive from the time

Mr. Whisman's vehicle came to a stop.  *Id.*  EMS technicians immediately began

administering medical assistance to Mr. Whisman.  (Dkt. 77-50; Dkt. 78-20:25).

At approximately 8:12 p.m., a second ambulance, from Medstar EMS Service, arrived. *Id.* Medstar technicians continued the treatment initiated by the Selfridge Fire Department EMS personnel. *Id.* At 8:21 p.m., a Medstar ambulance conveyed Mr. Whisman to Mt. Clemens General Hospital, arriving at approximately 8:31 p.m. *Id.* Mr. Whisman was treated in the emergency room, but died that night from his gunshot wounds. *Id.*

The pursuit of Mr. Whisman's vehicle at Selfridge lasted approximately fifteen minutes and 12.2 miles. (Dkt. 78-2; Dkt. 77-50). His average speed was just under 50 mph. *Id.* The posted speed limits along Whisman's route were 25 mph and 35 mph. *Id.*

Lt. Col. Regualos was the Commander of the 127th Security Squadron at Selfridge in May 2006. (Dkt. 77-46). Regualos had left the base after his normal workday at approximately 5:30 p.m. *Id.* After the security squadron began the pursuit of Whisman's vehicle, a member of Regualos' staff called him to notify him that someone had run the gate and shots had been fired. *Id.* Although Regualos proceeded immediately to base, when he arrived, the chase was over and Mr. Whisman was being put into an EMS ambulance. *Id.*

As Commander of the 127th, Lt. Col. Regualos was responsible for appointing an investigator of the shooting. *Id.* Because his unit did not have an investigator, he was forced to choose between asking the Michigan State Police

and the Macomb County Sheriff's Department to investigate.  *Id*.  Lt. Col.

Regualos chose the Michigan State Police, which conducted an investigation and

presented its findings to the Macomb County Prosecutor's Office.  *Id*.  On August

7, 2006, the Prosecutor's Office issued a letter finding that the use of deadly force

by members of the 127th was justified.  (Dkt. 77-51).  Lt. Col. Regualos, who was

deployed overseas at the end of May, was not present for the investigation, nor did

he play any further role in it.  (Dkt. 77-46).

Lt. Col. Regualos was also responsible for the overall preparation and

training of Squadron personnel.  *Id*.  The training provided was dictated by the Air

Force Security Forces Center at Lackland Air Force Base in Texas.  *Id*.  The Center

provided training plans and materials to all Security Squadrons throughout the Air

Force.  *Id*.  Lt. Col. Regualos followed all of the Air Force training devices.  *Id*.

He arranged regular and continuous training through managers, including

mandatory training on the use of deadly force at least once a year.  *Id*. Specific

training on how to respond to gate runners was provided, including training on

TCPs.  *Id*.  Personnel were trained to pursue a runner until he stopped.  *Id*.

Plaintiff points out that they were not trained in how to handle a vehicle that would

not respond to flashing lights and sirens.  (Dkt. 81, Ex. 48, pp. 7-8).  In addition,

Lt. Col. Regualos testified that pit training was not required and he did not request

this kind of training because of the expense.  Apparently, he never requested video

training or written materials regarding pit training or handling a car that was not compliant.  (Dkt. 81, p. 9).

On the date of the shooting incident, some members of the 127th had received high speed chase and pit maneuver training while others had not.  (Dkt. 77-46).  However, pit maneuver training was not mandated by the Air Force.  *Id.* Lt. Col. Regualos did not request this type of training because of the expense involved and because of safety waiver issues.  *Id.*  High speed chases were unusual at Selfridge and only one other incident is known to have occurred.  *Id.*

The 127th was not equipped with spike strips, devices that can be placed across a road by law enforcement officers to puncture the tires of a fleeing vehicle in an effort to get it to slow down and stop, on May 17, 2006.  *Id.*  Lt. Col. Regualos had requested funding for such devices on multiple occasions, but his requests were denied by the financial management board.  *Id.*

B.     Plaintiff's Complaint

Plaintiff alleges that defendants Christian, Heatley, King, Mitchell, and Werhmnyak violated Mr. Whismam's Fourth Amendment right to be free from unreasonable force when being seized by law enforcement officers and his constitutional right to have timely medical attention secured for him following the incident.  (Dkt. 49).  Plaintiff alleges defendant Lt. Col. Regualos violated Mr. Whisman's constitutional rights by failing to properly investigate the incident

which led to Mr. Whisman's death, to properly train members of the 127th Security Forces at Selfridge, and to provide spike strips for use by members of the Security Forces.  (Dkt. 82).  Plaintiff alleges defendant United States is liable, through the actions of Sgt. Christian, Sgt. Heatley, Senior Airman King, Sgt. Mitchell, and Sgt. Werhmyak, for gross negligence, assault and battery and false imprisonment.  (Case No. 09-14773, Dkt.1).  Plaintiff alleges defendant United States, through the acts of defendant Lt. Col. Regualos, was negligent.  *Id.*

In *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, the Supreme Court stated this jurisdiction gave "federal courts . . . the power to award damages for violation of 'constitutionally protected interests.'"  *Bivens*, 403 U.S. 388, 396 (1971).  The Sixth Circuit has stated *Bivens* "recognizes that the victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right."  *Wagner v. Metropolitan Nashville Airport Authority*, 772 F.2d 227, 230 (6th Cir. 1985).  Plaintiff claims that defendants Christian, Heatley, King, Mitchell, Werhmnyak and Regualos' above noted conduct violated Mr. Whisman's constitutional rights and, therefore, establishes a proper basis for a suit under *Bivens*.

The Federal Tort Claims Act 28 U.S.C. § 1346(b) (FTCA) contains a "broad waiver of the United States' sovereign immunity from tort liability."  *Downs v.*

*U.S.*, 522 F.2d 990, 994 (6th Cir. 1975). Under the Act, federal courts have jurisdiction to hear actions for injury or loss of property, or personal injury or death caused by negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. *Id.*, citing, 28 U.S.C. § 1346 (b). In this instance, the events underlying this action occurred in Michigan and, therefore, Michigan's negligence law and standards for the use of deadly force apply. *See Schindler v. United States*, 661 F.2d 552, 558-559 (6th Cir. 1981). Under Michigan law, deadly force is justifiable "if the defendant honestly and reasonably believes his life is in imminent danger or that there is a threat of serious bodily harm." *People v. Heflin*, 456 N.W.2d 10, 18 (Mich. 1990). Plaintiff alleges that defendant United States was grossly negligent under Michigan law, through the actions of defendants Christian, Heatley, King, Mitchell, and Werhmnyak and Sgt. Southern. (Case No. 09-14773, Dkt.1). Plaintiff also alleges that defendant United States is liable for assault and battery and false imprisonment for the actions taken by Christian, Heatley, King, Mitchell, and Werhmnyak to stop Mr. Whisman, including shooting at Mr. Whisman and driving their vehicles directly at his vehicle, because this force was "completely unreasonable and improper." (Dkt. 81). Finally, plaintiff claims that defendant

United States should be held liable for negligence based on defendant Regualos'
alleged failures to investigate the incident, properly train the 127th Security Forces,
and provide spike strips for use by members of the Security Forces. *Id*.

Plaintiff seeks compensatory and punitive damages from individual
defendants. (Dkt. 49). Plaintiff also seeks damages in the amount of Four Million
Two Thousand Four Hundred Dollars ($4,002,400.00) from defendant United
States. (Case No. 09-14773, Dkt.1)

C.     Defendants' Motions for Summary Judgment

Individual defendants Christian, Heatley, King, Mitchell, and Werhnyak
argue that they are entitled to qualified immunity because plaintiff has not
demonstrated a constitutional violation that resulted from unreasonable use of force
or a failure to provide medical care, and thus has failed to satisfy a necessary
requirement for establishing liability under a *Bivens* claim. (Dkt. 76). Similarly,
defendant Regualos argues that he is shielded from plaintiff's claims by qualified
immunity, because plaintiff has failed to demonstrate a constitutional violation that
resulted from defendant's actions in investigating the incident in question, training
the 127th Security Squadron, or attempting to provide spike strips to the Security
Squadron. *Id*. Defendant Regualos argues that he is entitled to qualified immunity
regarding the investigation because he was not presented with a strong indication
of unconstitutional conduct when investigating the incident in question. *Id*. He

argues that he is entitled to qualified immunity regarding the training of the 127th Security Squadron, because plaintiff has failed to show that his training demonstrated reckless or callous indifference to the right of citizens. *Id.* And he argues that he is entitled to qualified immunity regarding the alleged failure to provide spike strips, because he made efforts to procure such devices, but was denied funding by the financial management board at Selfridge, and thus, he cannot be held personally liable for a failure to make them available to the 127th Security Squadron. *Id.*

Individual defendants Christian, Heatley, King, Mitchell, and Werhnyak also argue that all of the shots fired at Mr. Whisman, save the last two fired by Sgt. Mitchell, cannot constitute a seizure under the Fourth Amendment. *Id.* Defendants state that a seizure only occurs when a fleeing person is physically touched by police or when he or she submits to a show of authority. *Id.* Defendants argue that because Mr. Whisman was touched by only the final two shots fired by Sgt. Mitchell, all other Fourth Amendment claims against Christian, Heatley, King, Mitchell, and Werhnyak must fail. *Id.*

Defendant United States alleges that there is no evidence of a failure to communicate with Mr. Whisman, and therefore, no evidence of gross negligence. (Dkt. 85). Defendant argues that officers adequately communicated Mr. Whisman's need to stop his vehicle, by posting signs at the main gate and by

pursuing him in a high speed chase around the base with multiple fully-marked law

enforcement vehicles that had their lights and sirens active.  *Id*.  Defendant United

States argues that plaintiff's claims of assault and battery have no merit, because

defendants' use of deadly force was justifiable under Michigan law.  (Dkt. 78).

Defendant argues plaintiff's claim of false arrest has no merit, because Mr.

Whisman's arrest was legal and based on probable cause.  *Id*.

Finally, defendant United States argues that plaintiff cannot establish

liability for negligence based on the actions of Lt. Col. Regualos.  *Id*.  First, the

United States argues that Lt. Col. Regualos was not negligent, and, therefore, the

United States cannot be held liable.  *Id*.  Second, the United States argues that it is

shielded by sovereign immunity under the discretionary function exception

provided in 28 U.S.C. § 2680(a).  *Id*.  The United States argues that Regualos'

investigation of the incident, training of the 127th squadron, and decisions

regarding providing spike strips did not involve a mandatory regulation or policy

that allowed no choice.  *Id*.  The United States also alleges that Regualos' choices

in these matters were "based on considerations of public policy."  *Id.*, quoting,

*Rosebush v. United States*, 119 F.3d 438, 440 (6th Cir. 1997).  For these reasons,

the United States asserts that Regualos' actions fall within the discretionary

function exception, and, therefore, the United States is shielded from a negligence

claim by sovereign immunity.  (Dkt. 78).

D.    Plaintiff's Responses to Defendants' Motions

Plaintiff maintains that there are material facts in dispute and that the

evidence presented in this case is such that a reasonable jury could find for the

plaintiff.  (Dkt. 82).  Plaintiff asserts that individual defendants Christian, Heatley,

King, Mitchell, and Werhnyak's actions in discharging their firearms at Mr.

Whisman are not protected by qualified immunity, because excessive force was

used.  *Id*.  Plaintiff argues this force did not meet the reasonableness standard

required by the Fourth Amendment.  *Id*.  Plaintiff points to the regularity with

which visitors at Selfridge failed to stop at the main gate, conflicting evidence as to

Mr. Whisman's rate of speed as he entered the base and Mr. Whisman's state of

mind when directed his vehicle at security force members, and the limited evidence

presented suggesting that residents and visitors at Selfridge were endangered by

Mr. Whisman's actions, to argue that a trier of fact could determine that

defendants' use of deadly force was unreasonable.  *Id*.  Plaintiff denies that Mr.

Whisman used his vehicle as a weapon, drove off the roadway several times to

avoid capture, or engaged in behavior that threatened the lives of those around him.

*Id*.  Instead, plaintiff argues that Mr. Whisman was unarmed and non-dangerous

when shot at by members of the 127th.  *Id*.  Finally, plaintiff points to the 127th's

own deadly force policy to suggest that defendants were on notice that their actions

in firing at Mr. Whisman were unreasonable.  *Id*.

Although plaintiff recognizes that some cases have held that shots fired at an individual that do not hit the individual or cause the individual to stop do not constitute a Fourth Amendment seizure, plaintiff contends that no bright line rule exists. *Id.* Plaintiff argues that the Sixth Circuit has held that an officer who "fails to act to prevent the use of excessive force may still be held liable where '(1) the officer observed or had reason to know that excessive force would be or was being used and (2) the officer had both the opportunity and the means to prevent the harm from occurring.'" *Id.*, quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). Plaintiff also alleges that when deadly force which does not strike an individual is employed which escalates a situation by "unambiguously signaling that such force was called for," such force can be found to be a seizure. *Floyd v. City of Detroit*, 518 F.3d 398, 407 (6th Cir. 2008). Plaintiff asserts that each of the shots fired by defendants escalated the incident in question, until Sgt. Mitchell fired the final fatal shots, and therefore, each shot constituted a Fourth Amendment seizure under *Floyd*. (Dkt. 82).

Plaintiff does not dispute that EMS personnel provided adequate medical care to Mr. Whisman, but instead argues that individual defendants should be held liable for failure to provide medical care, because none of the officers present provided medical treatment themselves. *Id.* Plaintiff asserts that this failure occurred, because defendants chose to drag Mr. Whisman out of his car, handcuff

him, and throw him on the ground, instead of immediately assessing his medical condition. *Id.*

Plaintiff argues that defendant Regualos is not entitled to qualified immunity as a defense against plaintiff's claims of failure to train, failure to provide spike strips, or failure to investigate. *Id.* Plaintiff alleges that defendant Regualos demonstrated a callous and reckless indifference for Mr. Whisman's safety by failing to adequately train the 127th on how to "deal with a vehicle that refuses to compliantly stop upon request, especially given that he knew that type of training was necessary." *Id.* Plaintiff argues that Regualos was on notice that such training was necessary, because there was a history of gate runners at Selfridge and because Regualos himself had requested, but failed to provide, such training. *Id.*

Plaintiff argues that defendant Regualos failed to equip the 127th by failing to provide spike strips to the security forces under his command, though he knew that device would assist his men. *Id.* By failing to provide the device, plaintiff contends that defendant Regualos exhibited a callous indifference to the rights of citizens. *Id.*

Plaintiff also argues that defendant Regualos exhibited "callous disregard for the welfare of the public" by failing to conduct an administrative review of the incident in question. *Id.* Although plaintiff acknowledges that Regualos asked the Michigan State Police to conduct an investigation into the incident, plaintiff asserts

that by failing to conduct an administrative review in an effort to prevent such occurrences from happening in the future, Regualos should be held liable for failure to investigate.  *Id.*

Plaintiff argues that her gross negligence claim against defendant United States is distinct and independent from her claim of assault and battery, because  an alternative basis for the claim, breach of a legal duty to properly communicate with Mr. Whisman, has been alleged.  (Dkt. 81), citing *Bell v. Porter*, 739 F.Supp.2d 1005, 1015-16 (W.D. Mich. 2010).  Plaintiff uses the same legal analysis used against individual defendants to assert that the use of force against Mr. Whisman was unreasonable and, therefore, defendant United States should be held liable for assault and battery.  *Id.*

Plaintiff objects to defendants' allegations that Mr. Whisman committed several offenses, including assault of a federal officer, by the time his vehicle was stopped.  *Id.*  Plaintiff contends that Mr. Whisman drove around security blockades only after being imprudently shot at by security personnel and, therefore, defendants' lacked cause to unlawfully detain Mr. Whisman.  *Id.*  For these reasons, plaintiff argues that defendant United States should be held liable for false imprisonment.  *Id.*

Finally, plaintiff argues that defendant United States should be held liable for defendant Regualos' failure to train and equip the 127th and failure to

investigate the incident in question. *Id.* Plaintiff contends that the United States is

not shielded by the discretionary function exception to the Federal Tort Claims

Act, because defendant Regualos' actions did not "involve an element of

judgment" or involve "social, economic or political policy." *Id.*, citing *Gager v.

United States*, 149 F.3d 918 (9th Cir. 1998). For these reasons, plaintiff argues that

defendants' motions for summary judgment should be denied.

## III.   ANALYSIS AND CONCLUSIONS

### A.   Standard of Review

Summary judgment is appropriate when the record reveals that there are no

genuine issues as to any material fact in dispute and the moving party is entitled to

judgment as a matter of law. Fed.R.Civ.P. 56(c); *Kocak v. Community Health

Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005); *Thomas v. City of

Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). The standard for determining

whether summary judgment is appropriate is "whether the evidence presents a

sufficient disagreement to require submission to a jury or whether it is so one-sided

that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v.

McGowan*, 421 F.3d 433, 436 (6th Cir. 2005), quoting, *Anderson v. Liberty Lobby,

Inc.*, 477 U.S. 242, 251-52 (1986); *see also Tucker v. Union of Needletrades Indus.

& Textile Employees*, 407 F.3d 784, 787 (6th Cir. 2005). The court must consider

all pleadings, depositions, affidavits, and admissions on file, and draw all

2:08-cv-12133-BAF-MJH   Doc # 90   Filed 07/06/11   Pg 26 of 60   Pg ID 1099

justifiable inferences in favor of the party opposing the motion. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

Under Federal Rule of Civil Procedure 56, a party asserting a fact that cannot be or is not genuinely disputed must support that assertion by citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declaration, stipulations, admission, interrogatory answers, or other materials; or a showing that the materials cited do not establish the absence or presence of a genuine dispute or that an adverse party cannot produce admissible evidence to support the fact. Fed.R.Civ.P. 56(c)(1).[4]

B.  Unreasonable Seizure

In cases involving allegations of unreasonable seizure, before questions of

---

[4] Formerly, "Rule 56(e) require[d] that sworn or certified copies of all papers referred to in an affidavit must be attached to or served with that affidavit ... To be admissible, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence." *Johnson v. Memphis City Schools*, 2010 WL 1957267, *2 (W.D. Tenn. 2010), quoting, 10A Charles A. Wright, Arthur R. Miller and Mary Kay Kane, Federal Practice & Procedure, § 2722, at 379-80 & 382-84 (1988). According to the Advisory Comments to the recent amendments, this specific requirement was omitted because as unnecessary given the requirement in subdivision (c)(1)(A) that a statement or dispute of fact be supported by materials in the record. Comments, 2010 Amendments to Fed.R.Civ.P. 56, subdivision (c). Notably, the language changes have not changed the standard itself. *Id.* ("The standard for granting summary judgment remains unchanged.").

qualified immunity are discussed, a court should first determine whether a Fourth Amendment seizure occurred. *Adams v. City of Auburn Hills*, 336 F.3d 515, 519 (6th Cir. 2003). If no seizure occurred, no consideration of the reasonableness of an officer's conduct is necessary. *Id.* A Fourth Amendment seizure "occurs only when government actors have, 'by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen.'" *Id.*, quoting, *Terry v. Ohio*, 392 U.S. 1, 19 n. 16 (1968). The Supreme Court has held that a show of authority by police is not a Fourth Amendment seizure if the suspect does not yield. *Id.*, citing *California v. Hodari D.*, 499 U.S. 621 (1991). In *Cameron v. City of Pontiac*, the Sixth Circuit held that "deadly force alone does not constitute a seizure, absent an actual physical restraint or physical seizure." *Cameron v. City of Pontiac*, 813 F.2d 782, 784 (6th Cir. 1987). "Shooting at a fleeing person, but missing, is not a 'seizure.'" *Adams*, 336 F.3d at 519. Courts outside of the Sixth Circuit have also addressed this issue. *Id.*, citing, *Latta v. Keryte*, 118 F.3d 693, 699-700 (10th Cir. 1997) (a "plaintiff was 'seized' only when he stopped at a roadblock and not when the defendant-officer shot the tires of plaintiff's car in an unsuccessful pursuit.").

Plaintiff asserts that there is no "bright line rule exempting officers who [shoot] at, but don't hit an individual, from illegally seizing that person." (Dkt. 82). In support this assertion, plaintiff cites *Floyd v. City of Detroit*, 518 F.3d 398, 405 (6th Cir. 2008). However, the Sixth Circuit distinguishes *Floyd* from

*Cameron* and *Adams*, by noting that the plaintiff in *Floyd* was not a fleeing suspect. *Floyd*, 518 F.3d 398, 405 (6th Cir. 2008). The court also notes that the plaintiff in *Floyd* contended that he "halted in his tracks ... and even backed up slightly" after hearing an officer's shot fired. *Id.* at 406.

Here, unlike *Floyd*, it is undisputed that Mr. Whisman was a fleeing suspect. Plaintiff does not deny that Mr. Whisman drove onto Selfridge Air National Guard Base without properly stopping at the guardhouse at the main gate. Nor does plaintiff deny that, once on the base, Mr. Whisman was pursued for approximately fifteen minutes and 12.2 miles, by numerous marked security vehicles with their flashing lights and sirens activated. It is undisputed that Mr. Whisman drove around multiple TCPs designed to stop him and that he drove his vehicle at a number of security personnel, and at high speeds near a residential community and a golf course. Mr. Whisman also caused damage to a law enforcement vehicle while attempting to escape. The video surveillance evidence, which was viewed by the undersigned, showed Mr. Whisman being pursued by a number of marked security vehicles at a high rate of speed, demonstrating beyond any reasonable dispute that Mr. Whisman was aware that he was being pursued and that he had chosen to flee from the security forces. (Dkt. 77-50). Plaintiff does not suggest or offer any evidence showing Mr. Whisman attempted to halt his flight at any point during the incident.

The undersigned finds this case readily distinguishable from *Floyd* in several significant respects. First, Mr. Whisman was fleeing from the 127th Security Squadron and made no attempt to halt the high-speed chase he was engaged in at any point during the fifteen minute pursuit. Second, when Sgt. Christian, Sgt. Heatley, Senior Airman King, Sgt. Mitchell (first shot only), and Sgt. Werhnyak discharged their weapons at Mr. Whisman and his vehicle, they were firing at a fleeing suspect that refused to stop. Third, these shots did not hit Mr. Whisman, nor did they cause him to cease his flight. Hence, Mr. Whisman was never seized by defendants Christian, Heatley, King, Mitchell (first shot only), and Werhnyak. As there was no seizure for Fourth Amendment purposes by these defendants, plaintiff has not alleged a constitutional violation to support a *Bivens* action and these defendants are entitled to summary judgment on this claim.

C.    Qualified Immunity and Excessive Force

The doctrine of qualified immunity provides that "'[g]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Caldwell v. Moore*, 968 F.2d 595, 599 (6th Cir. 2000), quoting, *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Defendants are required to raise the affirmative defense of qualified immunity, but the plaintiff bears the burden of showing that defendants

are not entitled to qualified immunity.  *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir. 2002).

In *Saucier v. Katz*, the Supreme Court established a two-part test to determine if a defendant is entitled to qualified immunity.  *Saucier v. Katz*, 533 U.S. 194 (2001).  In the first part of the test, a court must determine whether the facts of the case, viewed in the light most favorable to the plaintiff, "show the officer's conduct violated a constitutional right."  *Id*. at 201.  In the second part of the test, a court must determine if "the right was clearly established."  *Id*.  If it is determined that the conduct in question violated a clearly established right, then the defense of qualified immunity does not apply.  In *Pearson v. Callahan*, the Supreme Court determined that the two-parts of the qualified immunity test may be analyzed in any order.  *Pearson v. Callahan*, 555 U.S. 223 (2009).  Without having to engage in the perhaps more complicated decision of determining whether plaintiff's constitutional rights had been violated, the Court found that the constitutional right claimed by plaintiff was not clearly established where lower court case law was consistent with the conduct of the officers and "principles of qualified immunity [should] shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law."

In the Sixth Circuit, a three step test has been developed, which breaks down the second prong of the Saucier test into distinct elements. To establish an

exception to qualified immunity, a plaintiff must: (1) establish a violation of a particularized Constitutional right; (2) show that the particularized Constitutional right was so clearly established at the time of the event that any reasonable officer would know that the behavior violated that right; and (3) present facts and evidence sufficient to show that the officer was objectively unreasonable in light of the clearly established particularized right. *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003). According to the Sixth Circuit, if the court finds that the first two requirements of *Saucier* have been satisfied, the final inquiry is "whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Sample v. Bailey*, 409 F.3d 689, 696 n. 3 (6th Cir. 2005), quoting *Feathers*, 319 F.3d at 848. The Sixth Circuit relies on the Supreme Court's holding that "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Sample*, 409 F.3d at 696 n. 3, quoting, *Saucier*, 533 U.S. at 205. "Somewhat more concretely, whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful action generally turns on the 'objective legal reasonableness' of the action, assessed in the light of legal rules that were 'clearly established' at the time it was taken." *Sample*, 409 F.3d at 696 n. 3, quoting, *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (internal citation

omitted).  Thus, the Supreme Court explained that "even if a court were to hold

that [an] officer violated the Fourth Amendment by conducting an unreasonable,

warrantless search, *Anderson* still operates to grant officers immunity for

reasonable mistakes as to the legality of their actions."  *Sample*, 409 F.3d at 696 n.

3, quoting, *Saucier*, 533 U.S. at 206.

    At the summary judgment stage, "once the relevant set of facts is determined

and all reasonable inferences are drawn in favor of plaintiff, to the extent supported

by the record, the question whether the detective's actions were objectively

unreasonable is 'a pure question of law.'"  *Chappelle v. City of Cleveland*, 585

F.3d 901, 909 (6th Cir.2009), quoting, *Scott v. Harris*, 550 U.S. 372 (2007); *see

also Dunn v. Matatall*, 549 F.3d 348, 353 (6th Cir. 2008) (explaining that *Scott*

"instructs us to determine as a matter of law whether the events depicted on [a]

video, taken in the light most favorable to [the nonmoving party], show that the

Officers' conduct was objectively reasonable.").  Where claimed "material issues

of fact" are plainly contradicted by the video evidence of events in question,

summary judgment may be granted in favor of defendants.  *See e.g., Griffin v.

Hardrick*, 604 F.3d 949, 955-56 (6th Cir. 2010).

    In determining whether a constitutional violation based on the Fourth

Amendment has occurred when there has been an allegation of excessive force, the

Sixth Circuit applies the "objective-reasonableness standard, which depends on the

facts and circumstances of each case viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight." *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007), citing, *Graham v. Connor*, 490 U.S. 386, 395-96 (1989). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396. "Relevant considerations include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Fox*, 489 F.3d at 236, quoting, *Graham*, 490 U.S. at 396.

Plaintiff argues that individual defendants Sgt. Christian, Sgt. Heatley, Senior Airman King, Sgt. Mitchell, and Sgt. Werhnyak are not protected by qualified immunity because their acts in discharging their firearms at Mr. Whisman constituted excessive force, and therefore violated his constitutional right to be free from unreasonable seizure. Plaintiff asserts that there are material facts that are in dispute regarding this claim that speak to the reasonableness of the use of force, including the speed at which Mr. Whisman was traveling during some portions of the pursuit, whether Mr. Whisman intentionally intended to injure the officers attempting to stop him, whether children and golfers were forced to scramble out

of the way to avoid being hit by Mr. Whisman's vehicle during the pursuit, and whether Mr. Whisman's collision with Sgt. Mitchell's vehicle was intentional or accidental.

However, plaintiff does not dispute that Mr. Whisman failed to observe clearly marked signs indicating that all vehicles must stop at the main gate, nor does plaintiff dispute that Mr. Whisman traveled onto Selfridge at a speed exceeding the posted speed limit. In fact, the video evidence plainly shows that Mr. Whisman failed to stop at the main gate and swerved around a car stopped at the guardhouse as he proceeded onto Selfridge. (Dkt. 77-50). Plaintiff does not dispute that Mr. Whisman failed to stop when members of the 127th Security Force began to pursue him with their lights and sirens activated, nor does plaintiff dispute that Mr. Whisman swerved his vehicle around multiple TCPs blocking his lane of travel. Again, video evidence shows that Mr. Whisman was being pursued by a number of marked security vehicles with their emergency lights activated. *Id.* Plaintiff does not dispute that Mr. Whisman hit Sgt. Mitchell's vehicle in the control tower parking lot, nor does plaintiff dispute that Mr. Whisman drove at a high rate of speed though a residential area of the base and on a road that went through the base golf course.

In *Scott v. Harris*, the Supreme Court stated that "in judging whether [a defendant's] actions were reasonable, we must consider the risk of bodily harm

that [defendant's] actions posed to [the suspect] in light of the threat to the public

that [the defendant] was trying to eliminate." *Scott*, 550 U.S. at 383. In measuring

these risks, it is appropriate to "take into account not only the number of lives at

risk, but also their relative culpability." *Id.* at 384. In *Scott*, the Court considered

the fact that it was the plaintiff "who intentionally placed himself and the public in

danger by unlawfully engaging in the reckless, high-speed flight that ultimately

produced the choice between evils that [the defendant] confronted." The Court

also noted that "[m]ultiple police cars, with blue lights flashing and sirens blaring,

had been chasing respondent for nearly 10 miles, but [the plaintiff] ignored their

warning to stop." *Id.* Finally the court stated that "by contrast, those who might

have been harmed had [the defendant] not taken the action he did were entirely

innocent." *Id.* For these reasons, the Court concluded that it was reasonable for

the defendant in the case to take the action, executing a pit maneuver, he did. *Id.*

Similarly, in this incident, Mr. Whisman intentionally placed himself, the residents

of Selfridge, and the officers engaged in his pursuit in danger by unlawfully

engaging in a reckless high-speed chase. Multiple Security Squadron vehicles

pursued Mr. Whisman with their lights flashing and sirens blaring for more than 12

miles, but Mr. Whisman ignored their warnings to stop. Mr. Whisman produced

the choice of evils Sgt. Mitchell and his fellow officers faced. Those Mr. Whisman

might have harmed by his actions, residents of Selfridge and the pursuing officers,

were entirely innocent, while Mr. Whisman was responsible for causing the high speed chase.

Plaintiff cites *Floyd* for the proposition that shooting an unarmed non-dangerous person is a violation of his or her Fourth Amendment protections against the use of unreasonable force. (Dkt. 82). In *Floyd*, police offers received a report that Mr. Floyd had been engaged in an argument with a neighbor and had threatened this individual with a shotgun. 518 F.3d at 402. When the officers confronted Floyd near his home, Floyd did not attempt to evade the officers, but stood still. *Id*. Both officers fired at Floyd, one missing and one hitting Floyd in the upper right portion of his chest. *Id*. The officer whose bullet hit Floyd claimed that he believed Floyd was armed with a handgun when he fired, but no handgun was found after the incident. *Id*. at 403. The Sixth Circuit found that the set of factors in *Floyd* failed to establish an objectively reasonable use of excessive force and the officers were not entitled to the defense of qualified immunity. *Id*. at 407. Plaintiff's attempt to analogize the situation facing the officers in *Floyd* to the situation facing Sgt. Mitchell and the other members of the 127th Security Force in this incident is unpersuasive. Mr. Whisman was armed with a deadly weapon (his vehicle), was fleeing officers when the lengthy high speed chase occurred, and had failed to cease his flight.

A closer analogous case, *Brosseau v. Haugen*, is cited by both plaintiff and

defendants.  In *Brosseau*, a defendant police officer shot the plaintiff in the back as he attempted to flee from law enforcement authorities in his vehicle.  *Brosseau v. Haugen*, 543 U.S. 194 (2004).  While fleeing, the plaintiff failed to respond to commands by defendant to exit his vehicle.  *Id*. at 196.  The Supreme Court found that the defendant was entitled to qualified immunity in this case, because it was not "clearly established" that defendant violated plaintiff's Fourth Amendment right, when she chose to shoot a fleeing suspect who presented a risk to others.  *Id*. at 199-200, citing, *Cole v. Bone*, 993 F.2d 1328, 1333 (8th Cir. 1993) ("holding the officer 'had probable cause to believe that the truck posed an imminent threat of serious physical harm to innocent motorists as well as to the officers themselves'"); *Smith v. Freeland*, 954 F.2d 343, 347 (6th Cir. 1992) ("noting 'a car can be a deadly weapon' and holding the officer's decision to stop the car from possibly injuring others was reasonable.").

In *Smith*, the Sixth Circuit held that an officer that made the decision to fire a fatal shot at a suspect that "had proven he would do almost anything to avoid capture" and that posed a significant threat to officers that had set up a roadblock in suspect's path of travel, was entitled to qualified immunity.  954 F.2d 343, 347. Notably, in *Smith*, the court also stated that in deciding a case alleging a constitutional violation based on excessive force, the fact that a defendant may have violated a local city or police policy should not be a part of the analysis used

in the decision.  *Id*. at 347-48 (adopting the Seventh Circuit ruling in *Ford v. Childers*, 855 F.2d 1271 (7th Cir. 1988).  Rather, a court should limit its analysis to whether defendant's acts violated the Constitution. *Id*.

Here, Mr. Whisman was shot in the back as he attempted to flee from law enforcement authorities in his vehicle.  He repeatedly failed to respond to signals that he needed to cease his flight.  He used his vehicle as a deadly weapon by operating it in an intentional or reckless manner.  Sgt. Mitchell and the other officers who made the decisions to fire at Mr. Whisman, did so to eliminate an imminent threat of serious physical harm.  Mr. Whisman had shown that he would do almost anything to avoid capture and failing to end the chase would have posed a substantial risk of injury to the officers pursuing him and the public at large at Selfridge.

Plaintiff argues that a question of fact exists because of the discrepancies in the officers' testimony regarding whether Mr. Whisman appeared to be trying to harm pedestrians and whether he was deliberately driving "at" the officers' vehicles.  Regardless of the varying points of view of the officers as to when and if they personally felt that Mr. Whisman deliberately put their lives at risk, it is clear from the chronology of events that an escalation of risk arose from plaintiff's

conduct throughout the chase.[5]  Specifically, the incident in the control tower

parking lot demonstrated that plaintiff was willing to engage in dangerous and life

threatening conduct by driving at the officer and hitting two cars, despite the fact

that it was a relatively large parking lot and that he apparently had room to go

around the vehicles that he hit.  This happened just before the security officers

made the decision to start shooting at Mr. Whisman.  Specifically, as Senior

Airman King testified, he was forced to jump out of the way to avoid being struck

by Mr. Whisman's vehicle.  (Dkt. 78-8; Dkt. 78-14).  Senior Airman King then

fired one shot at Mr. Whisman with his firearm.  (Dkt. 78-8).  As Mr. Whisman

drove away, Sgt. Werhnyak fired three shots at the rear of Mr. Whisman's vehicle.

(Dkt. 78-14).  While none of these shots hit Mr. Whisman, at least two officers

believed that the use of deadly force was necessary and appropriate at this point.[6]

---

[5]  Plaintiff relies heavily on Sgt. Christian's testimony that he was not in fear
of his life at the particular moment when Sgt. Mitchell pulled out his gun. In the
view of the undersigned, this does not mean that Mr. Whisman did not, throughout
the 15 minute chase, prove that "he would do almost anything to avoid capture"
and that his actions posed a significant threat to the officers that had set up multiple
roadblocks in his path of travel.  *Smith*, 954 F.2d 343, 347.  Moreover, the use of
deadly force may be justified where the officers reasonably believe that a suspect's
actions pose a threat to the public and any pedestrians, which was certainly the
case here.

[6]  Plaintiff argues that this would not have occurred but for Sgt. Mitchell's
statement over the radio that Mr. Whisman was using his vehicle as a deadly
weapon and should be treated as such.  There is no dispute that, at the time Sgt.
Mitchell made this statement, Mr. Whisman had just struck Sgt. Mitchell's vehicle
and another parked car.  Whether Mr. Whisman intended to harm Sgt. Mitchell or

Plaintiff does not create a genuine issue of material fact by arguing "that the video speaks for itself." (Dkt. 81, Ex. 53). Because of the panning video camera, the moment when Airman King would have jumped out of the way of Mr. Whisman's approaching vehicle is not captured on the videotape. However, nothing in the video contradicts defendants' version of events and the remainder of defendants' version of this particular sequence of events is fully supported by the video evidence. Given the escalating nature of plaintiff's action, it was reasonable for the officers to decide, at this point, that the use of deadly force was necessary and appropriate.

Plaintiff cites the 127th Security Forces' deadly force policy and suggests that Sgt. Mitchell and the other defendants charged with the use of excessive force violated the policy and the best practices advocated by the International Association of Chiefs of Police and such violations, if true, would demonstrate that defendants' use of deadly force was unreasonable. (Dkt. 82). However, under *Smith*, the court is limited to considering only if the dependants' acts constituted an unreasonable use of force under Constitutional law.

For the reasons provided above, no issue of material fact exists and defendant Mitchell is entitled to summary judgment on plaintiff's claim of

---

any other person, is irrelevant to the inquiry: did Mr. Whisman, by his actions, present an imminent risk of serious harm to the officers, the public, pedestrians and other drivers on the base? The answer to this question is unequivocally "yes."

excessive force.  If it were found that Sgt. Christian, Sgt. Heatley, Senior Airman

King, and Sgt. Werhnyak's actions in firing at Mr. Whisman constituted a seizure

under the Fourth Amendment, these defendants would also be entitled to qualified

immunity under the same analysis.

      D.    <u>Failure to Provide Medical Care</u>

      Individuals who have been detained by authorities are entitled to proper

medical care without unreasonable denial or delay.  *Estelle v. Gamble*, 429 U.S. 97,

104-05 (1976).  "Deliberate indifference" to the medical needs of an individual

incarcerated or detained by federal or state officials constitutes a violation of that

individual's constitutional rights. *Id.*; *Farmer v. Brennan*, 511 U.S. 825 (1994);

*Stiger v. O'Neill*, 53 Fed.Appx. 738 (6th Cir. 2002).  For individuals who have not

yet been convicted of an offense, this right is vested in the Fifth and Fourteenth

Amendment due process clause.  *See City of Revere v. Mass. General Hosp.*, 463

U.S. 239, 244 (stating that the Constitutional right protecting pre-trial detainees is

established in the Fourteenth Amendment due process clause, while the

Constitutional right protecting convicted prisoners is found in the Eighth

Amendment).  Whether the right to medical care is found in the Eighth, Fifth or

Fourteenth Amendment, "deliberate indifference" is the standard for determining a

constitutional violation.  *See County of Sacramento v. Lewis*, 523 U.S. 833, 850

(1998) (stating "since it may suffice for Eighth Amendment Liability that prison

officials were deliberately indifferent to the medical needs of their prisoners, it follows that such deliberately indifferent conduct must also be enough to satisfy the fault requirement for due process claims based on the medical needs of someone jailed while awaiting trial"); *Phillips v. Roane County, Tenn.*, 534 F.3d 531, 539 (6th Cir. 2008) (applying the "deliberate indifference" test to an allegation of denial of medical care to a pretrial detainee). "Deliberate indifference" is used whether a plaintiff has brought a claim under 28 U.S.C. § 1983 or *Bivens*. *See id.* (applying "deliberate indifference" in a 1983 action); *Stiger*, 53 Fed.Appx. at 740 (dismissing a claim of denial of medical care because there was not sufficient evidence to support a finding of "deliberate indifference" in a *Bivens* action).

The "deliberate indifference" test has an objective and a subjective component. *Farmer*, 511 U.S. at 834; *Watkins v. City of Battle Creek*, 273 F.3d 683, 687 (6th Cir. 2001) (Moore, J., dissenting). To satisfy the objective component 'the plaintiff must prove that the medical need was 'sufficiently serious.'" *Watkins*, 273 F.3d at 687 (Moore, J., dissenting), quoting, *Farmer*, 511 U.S. at 834). To satisfy the subjective component, "the plaintiff must show that the officials being sued had 'a sufficiently culpable state of mind.'" *Id.* An official has a "sufficiently culpable state of mind" if "the official knows of and disregards an excessive risk to . . . health or safety; the official must both be aware of facts

from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*, quoting, *Farmer*, 511 U.S. at 837. To avoid summary judgment on this issue, a plaintiff is "required to allege facts and proffer evidence that, when taken in the light most favorable . . . to her position, establishe[s] that the defendant . . . [was] 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [that they also drew] the inference.'" *Id.* at 689, quoting, *Farmer*, 511 U.S. at 837. Then, plaintiff must demonstrate that "the evidence, when viewed in the light most favorable to the [plaintiff], must support the conclusion that the officers 'acted or failed to act despite [t]his knowledge.'" *Id.*, quoting, *Farmer*, 511 U.S. at 842.

Plaintiff alleges that individual defendants Christian, Heatley, King, Mitchell, and Werhnyak are not entitled to a defense of qualified immunity and should be found liable for failing to render medical aide to Mr. Whisman after his vehicle came to a halt. Plaintiff does not dispute defendants' version of events regarding the care Mr. Whisman received. According to the officers on the scene, after Mr. Whisman's vehicle stopped, several officers exited their vehicles and approached Mr. Whisman's vehicle. Mr. Whisman was ordered out of his vehicle, but did not respond. Sgt. Mitchell proceeded to open Mr. Whisman's driver's side door, pull Mr. Whisman out of the vehicle, and place him in handcuffs. Mitchell then checked Whisman's body and discovered that he had two bullet wounds in his

back.  Mitchell detected a shallow pulse and shallow breathing and then immediately called an EMS ambulance to the scene.

The base security camera shows, and plaintiff does not dispute, that the EMS ambulance arrived at the scene less than three minutes from the time that Mr. Whisman's vehicle left the roadway and then came to a stop.  (Dkt. 77-50).  After arriving, EMS technicians immediately began administering medical care to Mr. Whisman.  Two additional MedStar ambulances later arrived on the scene and, at approximately 8:21 p.m., fifteen minutes after the call for the first ambulance was placed, Mr. Whisman was conveyed to Mt. Clemens General Hospital, where he was treated in the emergency room.

Plaintiff has the burden of proof to demonstrate not only that defendants knew of substantial risk of serious harm to Mr. Whisman, but that they failed to act despite this knowledge.  Plaintiff has failed to meet this burden.  Only three minutes passed from the time that Mr. Whisman's vehicle came to a stop to the time EMS arrived on the scene to treat his wounds.  During this time, defendants acted in a proactive way to discover if Mr. Whisman needed medical care by checking his body for wounds and by taking his pulse.  When it was discovered that Mr. Whisman needed medical attention, an ambulance was immediately called to the scene.  It is clear that once the officers on the scene became aware that Mr. Whisman required medical aid, the officers acted to immediately provide it.  For

this reason, defendants are entitled to the defense of qualified immunity and, therefore, for the reasons provided above, no issue of material fact exists and defendants are entitled to summary judgment on plaintiff's claim.

E.    Claims Against Defendant Regualos

Plaintiff alleges that defendant Regualos, as Commander of the 127th, failed to adequately train the 127th to deal with a vehicle that refuses to "compliantly stop upon request," and that this "demonstrates a callous and reckless indifference for which he must be held liable." (Dkt. 82). Plaintiff also alleges Regualos failed to properly equip the 127th by failing to secure "spike strips" for their use. Finally, plaintiff alleges that Regualos failed to properly investigate the incident involving Mr. Whisman.

In analyzing whether a defendant is entitled to qualified immunity, as set forth above, a court must consider whether a constitutional violation occurred. *Saucier*, 533 U.S. at 201. If no constitutional violation occurred, the inquiry ends, because the plaintiff has failed to meet the standard required for a claim under *Bivens* or 1983. As discussed above, defendants Christian, Heatley, King, Werhnyak, and Mitchell (first shot only) committed no Fourth Amendment seizure, nor any other constitutional violation by making the decision to fire at Mr. Whisman. Christian, Heatley, King, Werhnyak, and Mitchell are also entitled to qualified immunity as a defense against plaintiff's claims of excessive force and

failure to provide medical care.  Because no constitutional violation occurred,

defendant Regualos cannot be held liable for a failure to train or equip the 127th or

to investigate the incident at Selfridge.  Therefore, defendant Regualos is entitled

to summary judgment on all claims against him.

Even assuming that a constitutional violation was committed by defendants

Heatley, King, Werhnyak, or Mitchell, Lt. Col. Regualos is still entitled to a

defense of qualified immunity against plaintiff's claims.  "Liability cannot . . . be

based on the doctrine of respondeat superior."  *Loy v. Sexton*, 132 Fed.Appx. 624,

626 (6th Cir. 2005).  For supervisory liability to attach, "a plaintiff must prove that

the official 'did more than play a passive role in the alleged violation or showed

mere tacit approval of the goings on.'"  *Id*., quoting, *Bass v. Robinson*, 167 F.3d

1041, 1048 (6th Cir. 1999).  To prevail, "plaintiff must show that the official 'either

encouraged the specific incident of misconduct or in some other way directly

participated in it.'"  *Id*., quoting, *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir.

1999).  The official in question must be shown to have "implicitly authorized,

approved, or knowingly acquiesced in the unconstitutional conduct of the

offending officers."  *Id*. at 627, quoting, *Shehee*, 199 F.3d at 300.

In failure to train cases, the adequacy of a training program is analyzed "in

relation to the tasks the particular officers were required to perform."  *Id*. at 628,

citing, *Walker v. Norris*, 917 F.2d 1449, 1456 (6th Cir. 1990).  For liability to

Report and Recommendation
Motions for Summary Judgment
*Whisman v. Regualos*; Case No. 08-12133

attach, plaintiff must prove that Regualos' "omission of instruction on some

matters" caused the officers under his command to engage in conduct that

amounted to a "deliberate indifference to the rights those with whom they came in

contact." *Id.* Plaintiff and defendants cite *Rodrigues v. Betancourt-Lebron*, a First

Circuit case. *Rodrigues v. Betancourt-Lebron*, 14 F.3d 87, 92 (1st Cir. 1994). In

*Rodrigues*, the court states that "[a]n official displays such reckless or callous

indifference when it would be manifest to any reasonable official that his conduct

was very likely to violate an individual's constitutional rights." *Id.*

Plaintiff argues that defendant Regualos exhibited callous indifference by

failing to train the 127th in how to stop a noncompliant car and how to stop a

vehicle traveling on the base at a high rate of speed. (Dkt. 82). As evidence of

Regualos' indifference, plaintiff asserts that Regualos knew of the need for this

training, based on requests he made for his forces to participate in such training,

knew of the high frequency of gate runners at Selfridge, and yet still failed to offer

this training. *Id.*

However, even taking the facts in the light most favorable to plaintiff, the

evidence does not suggest that this knowledge demonstrates Regualos knew that

failure to provide such training would "very likely violate an individual's

constitutional rights." *Rodrigues*, 14 F.3d at 92. Plaintiff does not dispute that

Regualos followed all of the Air Force training directives in the training of his

officers, nor does plaintiff dispute that deadly force training occurred at least once per year and was mandatory. Plaintiff does not dispute that members of the 127th received training on how to handle gate runners through the operation of TCPs, nor does the plaintiff dispute that the 127th received training on the use of emergency lights, sirens, and horns. Defendant admits that Regualos did not provide pit maneuver training to his squadron, but this training was not mandated by the Air Force. Even if the court were to find that defendants Christian, Heatley, King, Werhnyak, or Mitchell violated Mr. Whisman's Fourth Amendment rights, there is no evidence that suggests a reasonable official would have known that the training provided was "very likely" to lead to the violation. Plaintiff provides no evidence that the training Regualos offered violated any legally mandated standard. *See Rodrigues*, 14 F.3d at 92. Although plaintiff's consultant report states that the vehicle stop, firearms, and pit maneuver training the 127th received was inadequate, there is no suggestion that the training was inferior to standard training provided to similar groups. (Dkt. 81-11). Plaintiff provides evidence that individuals regularly failed to stop at the main gate, but only one other high speed pursuit is known to have occurred at Selfridge. There was little history to suggest that training for high speed pursuits involving noncompliant drivers was reasonably necessary. Based on this evidence, defendant Regualos is entitled to qualified immunity and, therefore, summary judgment on this claim.

Plaintiff's claim that defendant Regualos failed to provide spike strips to the 127th fails on similar grounds.  Regualos cannot be held liable for this claim, because, as discussed above, no constitutional violation occurred.  Even assuming that a violation occurred, there is no evidence to suggest that Regualos' failure to provide spike strips was very likely to cause an individual's constitutional rights to be violated or that Regualos encouraged or participated in misconduct.  In fact, plaintiff does not dispute that Lt. Col. Regualos requested funding to purchase spike strips on multiple occasions before the incident with Mr. Whisman. While his requests were denied by the base financial management board because other priorities at Selfridge were deemed more critical, the failure to provide spike strips was due to no fault of his own, and therefore Regualos cannot be held personally liable for the failure.

Plaintiff's claim that defendant Regualos failed to adequately investigate the incident in question also fails.  For liability to attach, plaintiff has the burden to show that there was "a 'strong' indication of unconstitutional conduct" and that defendant ignored this indication by failing to investigate.  *Loy*, 132 Fed.Appx. at 627, citing, *Doe v. City of Roseville*, 296 F.3d 431, 439 (6th Cir. 2002) (holding that supervisors were not liable because they possessed no information indicating "a strong likelihood" of unconstitutional conduct by their subordinate).  In the absence of a strong indication, a failure to investigate is reasonable and defendant

cannot be held liable.  *Id.*

Here, there was no evidence to suggest that there was a strong likelihood of unconstitutional conduct.  As discussed above, Mr. Whisman's threat to the safety of pedestrians, other drivers, and the officers pursuing him and his efforts to actively resist and evade arrest by flight, provided the officers pursuing him with reasonable justification for the use of deadly force.  As part of his duties, Regualos was responsible for appointing an investigator, but, because his National Guard Unit had no investigator, he was forced to ask either the Macomb County Sheriff's Department or the Michigan State Police to investigate the incident in question. Plaintiff does not dispute that Lt. Col. Regualos asked the Michigan State Police to conduct a criminal investigation into the shooting, such investigation occurred, or that, after reviewing the findings of the investigation, the Macomb County Prosecutor's Office determined that the use of deadly force against Mr. Whisman was justified.  For these reasons, it is clear that Lt. Col. Regualos fulfilled his duty to investigate, or at the very least, had no strong evidence of unconstitutional conduct that would have required him to make additional efforts to investigate. Therefore, defendant Regualos is entitled to summary judgment on this claim.

F.    Gross Negligence

Plaintiff alleges that defendant United States was grossly negligent, through the actions of defendants Christian, Heatley, King, Mitchell, and Werhmnyak, for

failing to properly communicate the need to stop to Mr. Whisman prior to using

deadly force, for failing to know and understand Mr. Whisman's state of mind

before using deadly force, and for failing to follow proper standards before

applying deadly force.  (Case No. 09-14773, Dkt.1).  Defendant argues that, insofar

as this claim is based on intentional acts, such as the allegation that members of the

127th wrongfully discharged their weapons at Mr. Whisman, plaintiff has not

stated a claim on which relief can be granted.  (Dkt. 85).

Under 28 U.S.C. § 1346 (b), the Federal Tort Claims Act, liability is

determined "in accordance with the law of the place where the act or omission

occurred."  *Downs*, 522 F.2d at 994, citing 28 U.S.C. § 1346 (b).  The events

underlying this action occurred in Michigan and, therefore, Michigan's law

applies.  *See Schindler*, 661 F.2d at 558-559.  In *VanVorous v. Burmeister*, the

Michigan Court of Appeals stated that "attempts to transform claims involving

elements of intentional torts into claims of gross negligence" should be rejected.

*VanVorous v. Burmeister*, 687 N.W.2d 132, 143 (Mich. Ct. App. 2004). However,

when allegations of gross negligence are "independent and distinct from . . .

allegations of excessive force . . . [the claims] do not fall within the rule set forth in

VanVorous."  *Bell v. Porter*, 739 F.Supp.2d 1005, 1015 (W.D. Mich. 2010).

Plaintiff asserts that defendants' failure to properly communicate with Mr.

Whisman is independent and distinct from the allegations of excessive force and

provides an alternate basis for the gross negligence claim. (Dkt. 81). However, the facts in this case are analogous to those in *VanVorous*. In *VanVorous*, the plaintiff's gross negligence claim stated that the defendant officers "breached the duty of care they owed to Mr. VanVorous by utilizing excessive force to subdue or control Mr. VanVorous and failing to follow proper police procedure in apprehending him." *VanVorous*, 687 N.W.2d at 143. Plaintiff's claim in this case is substantially similar. The allegation that defendants' failed to communicate before using deadly force is simply an attempt to "transform" an excessive force claim into a claim of gross negligence. For this reason, a claim of assault and battery, not gross negligence, is the proper avenue to bring a claim that the 127th intentionally and wrongfully discharged their firearms. Even assuming that a gross negligence claim is proper, defendants would be entitled to summary judgment on this claim, because, as discussed earlier, the use of deadly force was reasonable.

G.     Assault and Battery

Plaintiff alleges that defendant United States should be held liable for assault and battery for the actions taken by Christian, Heatley, King, Mitchell, and Werhmnyak to stop Mr. Whisman, including shooting at Mr. Whisman and his vehicle, because use of this force was unreasonable. Under Michigan law, deadly force is justifiable "if the defendant honestly and reasonably believes his life is in imminent danger or that there is a threat of serious bodily harm." *People v. Heflin*,

456 N.W.2d 10, 18 (Mich. 1990).  Deadly force is also justifiable if there is "a

significant threat of death or serious physical injury . . . [to] others." *Washington v.*

*Starke*, 433 N.W.2d 834, 837 (Mich. Ct. App. 1988).

As discussed earlier, Mr. Whisman intentionally placed himself, the

residents of Selfridge, and the officers engaged in his pursuit, in danger of death or

serious physical injury by unlawfully engaging in a reckless high-speed chase.  Mr.

Whisman was pursued by multiple Security Squadron vehicles, with their lights

flashing and sirens blaring, for more than 12 miles, but ignored their warnings to

stop.  Mr. Whisman drove at a high rate of speed through residential areas.

Perhaps most significantly, Mr. Whisman intentionally or recklessly directed his

vehicle at the officers attempting to stop his flight and caused a collision with a

Sgt. Mitchell's vehicle.  Defendants had cause to reasonably assume that Mr.

Whisman, by his actions, would cause death or significant injury, if not stopped.

For this reason, the use of deadly force was justified.  Therefore, no issue of

material fact exists and defendant is entitled to summary judgment on this claim.

H.    Underline False Imprisonment

Plaintiff alleges that defendant United States should be held liable for false

imprisonment for actions taken by Christian, Heatley, King, Mitchell, and

Werhmnyak. Plaintiff asserts that Mr. Whisman was attempting to leave Selfridge,

that the shots fired by defendants at Mr. Whisman confined him illegally, and that

Mr. Whisman was conscious of these actions before his death.  Michigan law defines false imprisonment as the "unlawful restraint of an individual's personal liberty."  *Moore v. City of Detroit*, 652 N.W.2d 688, 690 (Mich. Ct. App. 2002). To prevail on a claim of false imprisonment, plaintiff "must show that the arrest was not legal, i.e., the arrest was not based on probable cause."  *Peterson Novelties, Inc. v. City of Berkley*, 672 N.W.2d 351, 362 (Mich. Ct. App. 2003).  "If the arrest was legal, there has not been a . . . false imprisonment."  *Id*.  If the facts of a case are undisputed, "the determination of whether probable cause exists is a question of law for the court to decide."  *Id*.

Although plaintiff objects to the allegation that Mr. Whisman had committed several offenses by the time his vehicle was stopped and he was handcuffed, even taken in the light most favorable to the plaintiff, the uncontested facts of this case are that Mr. Whisman failed to stop at the Selfridge main gate, traveled at a rate of a high rate of speed significantly above the posted speed limit on the roads at Selfridge, ran multiple stop signs, and drove his vehicle off the roadways at Selfridge and onto grass in order to avoid TCPs.  By the time Mr. Whisman was arrested, probable cause existed for the 127th to arrest him.  Therefore, the arrest made by Sgt. Mitchell was legal and defendant is entitled to summary judgment.

I.    Negligence Based on Acts of Defendant Regualos

Finally, plaintiff claims that defendant United States should be held liable

for negligence based on defendant Regualos' alleged failures to investigate the

incident in question, properly train the 127th Security Forces, and provide spike

strips for use by members of the security forces.  (Case No. 09-14773, Dkt.1).

Defendant argues, first, that there is no issue of material fact as to whether

defendant Regualos acted negligently and, second, that even if such an issue exists,

the United States is shielded from liability based on the discretionary function

exception of the Federal Tort Claims Act (FTCA).  (Dkt. 78).

For the reasons stated above in the court's earlier discussion of plaintiff's claims

against defendant Regualos, no issue of material fact exists as to defendant

Regualos' negligence and summary judgment should be granted on this basis. Even

assuming that defendant Regualos was found to be negligent, the United States

would be shielded from liability on this claim.

     The FTCA discretionary function exception exempts from the act any waiver

of sovereign immunity for "[a]ny claim . . . based upon the exercise or performance

or the failure to perform a discretionary function or duty on the part of . . . an

employee of the Government, whether or not the discretion involved be abused."

28 U.S.C. § 2680(a).  Through a series of cases, the Supreme Court developed a

two-part test to determine if a claim falls within this exception. *Rosebush v .United*

*States*, 119 F.3d 438, 441 (6th Cir. 1997).  The test requires that a court first

determine "whether the challenged act or omission violated a mandatory regulation

or policy that allowed no judgment or choice." *Id.* Such determination would be found if "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive." *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). Second, a court must determine whether the conduct is "of the kind that the discretionary function exception was designed to shield." *Id.*, quoting, *United States v. Gaubert*, 499 U.S. 315, 322-23 (1991). If the judgment used by the official involved "consideration of social, economic, or political policy, the exception applies." *In re Glacier Bay*, 71 F.3d 1447, 1450 (9th Cir. 1995).

Here, defendant Regualos exercised discretion in investigating the incident in question, in selecting the training of members of the 127th, and in attempting to provide spike strips to the officers under his command. As Commander of the 127th, Regualos could have chosen to ask either Michigan State Police and the Macomb County Sheriff's Department to investigate the incident in question and made a choice to ask the Michigan State Police to perform the investigation. Lt. Col. Regualos was not limited to the training mandated by the Air Force Security Forces Center, but could provide those under his command with additional training at his discretion, as evidenced by his requests to have officers participate in high speed chase training. Lastly, the decision to request spike strips for the 127th was a discretionary decision Regualos made on his own. The Air Force did not

mandate the use of these devices, and, in fact, the base financial management board denied his requests.  For these reasons, the first part of the discretionary function test has been met.

As defendants point out in their brief in support of the motion for summary judgment, case law supports the proposition that decisions about whether to conduct an internal investigation or how to investigate fall within the discretionary exception, because they have been found to be based on considerations of social, economic or political policy.  *See Sabow v. United States*, 93 F.3d 1445 (9th Cir. 1996); *Blakey v. United States*, 991 F.2d 148 (4th Cir. 1993); *Rourke v. United States*, 744 F.Supp 100, 102 (E.D. Pa. 1988).  As the court stated in *Sabow*, "[i]nvestigations by federal law enforcement officials, particularly those involving the U.S. military, clearly require investigative officers to consider relevant political and social circumstances in making decisions about the nature and scope of a criminal investigation."  93 F.3d at 1453.  Similarly, failure to train claims have been found to fall within this exception.  *See Gager v. United States*, 149 F.3d 918, 921-22 (9th Cir. 1998) (finding that in deciding whether to institute training in mail bomb detection, the Postal Service was forced to weigh considerations of political and economic policy).

Finally, the Sixth Circuit has stated "[d]ecisions concerning the proper response to hazards are protected from tort liability by the discretionary function."

*Rosebush*, 119 F.3d at 443 (finding that the United States Forrest Service's decision concerning whether to place gratings over and protective railings around a fire pit involved political and economic policy). The court has also recognized that decisions on "whether and how to make federal lands safe for visitors require making policy judgments protected by the discretionary function exception." *Id.*, citing, *Autery v. United States*, 992 F.2d 1523, 1527 (11th Cir. 1993). Here, Regualos' decision to request spike strips for the 127th for use during stops on the base, involved a decision concerning the proper response to a hazard which involved a question of how to make federal land safe for visitors. Knowing of the Selfridge's limited resources and the potential benefit of the devices, Regualos' decision to request and the financial management board's decision to deny the request for spike strips obviously involved considerations of political and economic policy.

For these reasons, even if an issue of material fact was found regarding a claim of negligence based on Regualos' actions, the United States has shown that these actions fall within the discretionary function exception of the FTCA, and, therefore, the United States is entitled to sovereign immunity on this claim. Defendant United States is entitled to summary judgment on this claim.

## IV.    RECOMMENDATION

For the reasons stated above, the undersigned **RECOMMENDS** that

defendants' motions for summary judgment be **GRANTED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may

Report and Recommendation
Motions for Summary Judgment
*Whisman v. Regualos*; Case No. 08-12133

rule without awaiting the response.

Date: <u>July 6, 2011</u>                              <u>s/Michael Hluchaniuk</u>
                                                 Michael Hluchaniuk
                                                 United States Magistrate Judge

## **<u>CERTIFICATE OF SERVICE</u>**

    I certify that on <u>July 6, 2011</u>, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to the following: <u>Kenneth H. Karam, Patricia A. Maceroni and William L. Woodard</u>.

                                                 <u>s/Tammy Hallwood</u>
                                                 Case Manager
                                                 (810) 341-7887
                                                 tammy_hallwood@mied.uscourts.gov

Report and Recommendation
Motions for Summary Judgment
*Whisman v. Regualos*; Case No. 08-12133